**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**NORTHERN DIVISION**

|  |  |
|---|---|
| BOOTHE FARMS, INC.; BIG RISK FARMS, INC.; JEFFREY D. BOOTHE; TERRY BOOTHE; ADAM BOOTHE; RINEHART FAMILY FARMS II; MM FAMILY FARMS; AND WILLIAM J. DORE individually and on behalf of all those similarly situated,<br><br>               Plaintiffs,<br>v.<br><br>THE DOW CHEMICAL CO.; DOW AGROSCIENCES LLC; CORTEVA AGRISCIENCE; AND DU PONT DE NEMOURS AND CO.,<br><br>               Defendants. | Civil Action No.<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Boothe Farms, Inc.; Big Risk Farms, Inc.; Jeffrey D. Boothe; Terry Boothe; Adam Boothe (collectively referred to as "Boothe Farms"); Rinehart Family Farms II; MM Family Farms (collectively referred to as "Rinehart Farms"); and William J. Dore (referred to as "Dore Farms") (all of which are collectively referred to herein as "Plaintiffs"), individually and on behalf of a Class of similarly situated individuals (the "Class"), bring this Class Action Complaint against Defendants The Dow Chemical Co.; Dow AgroSciences LLC; Corteva Agriscience; and Du Pont De Nemours and Co.; (collectively referred to herein as "Defendants" or "Dow"). Plaintiffs allege as follows upon personal knowledge as to their own acts and experience, and upon information and belief and the investigation of their attorneys as to all other matters:

## NATURE OF THE CASE

1.      This is an action for damages suffered by Plaintiffs as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the research, design, development, manufacture, testing, promotion, marketing, advertising, distribution, labeling, and/or sale of Loyant herbicide for use on rice crops.

2.      Dow specifically touted and continues to proclaim Loyant's ability to *control* certain weeds, such as barnyardgrass, while also representing that Loyant would not impact or harm rice crops or yields (or that any such impacts would be temporary).  In direct contrast to these representations, however, Loyant failed to control barnyardgrass as well as other grasses and weeds and damaged Plaintiffs' and the Class Members' rice crops causing financial loss.

3.      Plaintiffs seek relief in this action individually and on behalf of all purchasers of Loyant.

## PARTIES

4.      Plaintiffs Boothe Farms, Inc., Big Risk Farms, Inc., Jeffrey D. Boothe, Terry Boothe, and Adam Boothe (collectively referred to as "Boothe Farms"), are citizens and residents of the State of Arkansas.  Boothe Farms grows rice in Lawrence County and Greene County, Arkansas.  In 2018, Boothe Farms purchased and applied Defendants' Loyant herbicide to its rice crops.  Boothe Farms experienced damaged crops, reduced yields, and other losses as a result of its application of Loyant.

5.      Plaintiffs Rinehart Family Farms II and MM Family Farms (collectively referred to as "Rinehart Farms"), are citizens and residents of the State of Missouri.  Rinehart Farms grows rice in Butler County and Stoddard County, Missouri.  In 2018, Rinehart Farms purchased and

applied Defendants' Loyant herbicide to its rice crops.  Rinehart Farms experienced damaged crops, reduced yields, and other losses as a result of its application of Loyant.

6.      Plaintiff William J. Dore (collectively referred to as "Dore Farms"), is a citizen and resident of the State of Louisiana.  Dore Farms grows rice in Acadia Parish, Louisiana.  In 2019, Dore Farms purchased and applied Defendants' Loyant herbicide to its rice crops.  Dore Farms experienced damaged crops, reduced yields, and other losses as a result of its application of Loyant.

7.      Defendant The Dow Chemical Company ("Dow Chemical"), is a Delaware corporation with its principle place of business in Michigan that, individually or through subsidiaries that it controls, researches, designs, develops, manufactures, tests, promotes, markets, advertises, distributes, labels, and/or sells agricultural chemicals and technologies, such as the Loyant herbicide at issue here.

8.      Defendant Dow AgroSciences LLC ("Dow AgroSciences") is a wholly-owned subsidiary of Dow and is a Delaware limited liability company with its principle place of business in Indiana that, individually or through subsidiaries that it controls, researches, designs, develops, manufactures, tests, promotes, markets, advertises, distributes, labels, and/or sells agricultural chemicals and technologies, such as the Loyant herbicide at issue here.  Dow AgroSciences is the registered owner of the "Loyant" trademark and registered Loyant with the United States Environmental Protection Agency, Arkansas State Plant Board, Louisiana Department of Agriculture & Forestry, Missouri Department of Agriculture, Texas Department of Agriculture, and Mississippi Department of Agriculture & Commerce.

9.      Defendant Corteva Agriscience ("Corteva") is a Delaware corporation with its principle place of business in Delaware that, individually or through subsidiaries that it controls, researches, designs, develops, manufactures, tests, promotes, markets, advertises, distributes,

3

labels, and/or sells agricultural chemicals and technologies, such as the Loyant herbicide at issue here.

10.     Defendant Du Pont De Nemours ("DuPont") is a Delaware corporation with its principle place of business in Delaware that, individually or through subsidiaries that it controls, researches, designs, develops, manufactures, tests, promotes, markets, advertises, distributes, labels, and/or sells agricultural chemicals and technologies, such as the Loyant herbicide at issue here.

11.     At all times relevant to this action, Defendants have been unified in interests and ownership. The entities are alter-egos of each other, and they have been collectively run as a single business enterprise. Thus, Defendants will subsequently be collectively referred to as "Dow."

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class Members, the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from the Defendant.

13.     This Court has personal jurisdiction over the Defendants because Defendants are registered to do business and operate within this state.

14.     Venue is proper in this District under 28 U.S.C. § 1391(a). Substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading information regarding the benefits and qualities of Defendants' Loyant herbicide occurred within this District.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A.     Rice Production

15.     Farmers have grown rice commercially in the United States for well over 100 years.

16.     U.S. farmers grow long grain, medium grain, and short grain rice and various varieties and brands of each.  In 2018, U.S. farmers planted approximately 2,198,000 acres of long grain rice, 707,000 acres of medium grain rice, and 41,000 acres of short grain rice.  In 2019, U.S. farmers planted approximately 2,057,000 acres of long grain rice, 658,000 acres of medium grain rice, and 41,000 acres of short grain rice.

17.     Arkansas is the largest rice producing state in the U.S., with California, Louisiana, Missouri, Texas, and Mississippi being the next largest to smallest respective rice producing states. Domestic rice is marketed and sold as a commodity domestically and abroad to foreign countries. The 2017 rice crop from the U.S. sold for approximately $2.2 billion.  This multi-billion-dollar industry is a prime market for Dow's agricultural products and endeavors.

18.     A rice farmer's profitability depends, in part, on the volume of rice produced from each acre of his or her operation.  The more rice produced from each acre, the higher the profit potential for the farmer.  In other words, if grass or other weeds occupy space in a given acre of a rice field where a rice plant could otherwise grow and produce rice, the amount of rice harvested from that acre is less compared to if there were no grass or weeds in that given acre.  Alternatively, if a rice plant is damaged and it produces less rice seed or no rice at all, the amount of rice harvested is less compared to if the rice plant was not damaged.

19.     Barnyardgrass is one of the most troublesome weeds in rice cultivation.  According to research by University of Arkansas Extension, heavy barnyardgrass infestation in rice can result in a yield reduction of 30 percent to complete crop loss.

20.     As a part of growing rice crops, many farmers use herbicides in an effort to kill and control the grasses and other weeds in their fields without harming their rice plants. Farmers do this to, among other things, increase the amount of rice produced from their acreage.

21.     As farmers have increasingly used herbicides, herbicide resistance has significantly increased rice production inputs and associated costs.  For example, some barnyardgrass can be resistant to multiple herbicides in a single production field.  Rice growers can spend more than twice as much as corn and soybean growers on an effective herbicide program.

22.     In addition to yield, a rice farmer's profitability is impacted by the rice's quality. In the rice industry, rice is sold on a per bushel basis and at a per bushel price.  The price a farmer receives for his rice is impacted by its "grade" and what is referred to as the rice crop's "milling yield."

23.     Rice is graded on its appearance (ideally, a white, clear, non-chalky color), smoothness of the kernels (ideally, no "pits," "chips," or damaged looking kernels) and its overall condition (ideally, non-damaged).  The grading system for rice is "#1" being the best grade to a "#6" being the worst grade.  Rice that is graded "#1" or "#2" typically receives the same or similar pricing for such grades.  As rice grades go down to a "#3", the price for such rice decreases as its grade decreases.  The "#6" grade is the worst grade and is referred to as "sample grade" rice.

24.     "Milling yield" impacts the price of rice because it costs rice mills money to mill rice.  After milling rice, mills want to be left with as many high quality graded whole kernel rice grains as possible and as few broken rice kernels as possible.  A higher milling yield will result in a farmer receiving a higher price for his rice.

25.     Milling yield is determined by milling 100 pounds of rice.  After milling 100 pounds of rice, the mill is left with a certain amount of whole kernels and broken kernels.  The

greater the amount of whole kernels as compared to broken kernels that exist out of the 100 pounds equates to a *higher* milling yield and vice versa.

26.     Milling yields are stated with the whole kernel amount first followed by the total amount of whole kernels and broken kernels added together.  The difference between the first number and the second number indicates the amount of broken kernels.  Generally speaking, examples of very good, average and poor milling yields are as follows:

- Very Good –  68/74

- Average    – 55/70

- Very Poor –  34/55

27.     As an example, using the "Very Good" milling yield of 68/74, such a milling yield would mean out of the 100 pounds of rice there were 68 pounds of whole kernels, 74 pounds of both whole kernels and broken kernels, and 6 pounds of broken kernel rice.

28.     Loyant adversely impacted rice farmers' field yield, grade and milling yield.

## B.     Development of Loyant

29.     Given the problems facing rice farmers, agri-chemical companies, such as Dow, have developed and sold herbicides for decades in order to enable farmers to kill and control the grasses and other weeds that can appear in U.S. rice fields ostensibly without harming, damaging or killing the farmers' rice plants.

30.     After years of development and testing, in 2017, Dow received Environmental Protection Agency ("EPA") registration for a new herbicide known as Loyant™ herbicide with Rinskor™ active (or "Loyant") for use in rice fields across the U.S. It also received state registrations in Arkansas, Louisiana, Missouri, Texas, Mississippi, Tennessee, and Iowa. However, no rice acres were reported in either Tennessee or Iowa in 2018 or 2019; and due to

California's regulatory standards and requirements, Loyant has not been commercially released for use in rice fields in that state.

31.     Loyant is a Group 4 (auxin type) herbicide as it affects plant hormones and how the plant grows.  Dow marketed Loyant as providing broad-spectrum weed control on a range of grasses, broadleaves, sedges and aquatics, including problematic grasses such as resistant barnyardgrass, or jungle-rice.

32.     Rinskor Active is Dow's brand name for florpyrauxifen-benzyl, the active ingredient in Loyant.

### C.     Dow's Representations about Loyant

33.     As a part of the launch of its Loyant herbicide in the states where it obtained registration, Dow developed a massive advertising and promotional campaign to sell farmers on the purported benefits of switching to Loyant.  Through written materials, websites, press releases, farmer presentations, and sales representatives, Dow widely touted and continues to proclaim that Loyant effectively controls weeds, such as barnyardgrass, and does not impact yields or harm rice crops.  These representations were false.

34.     Before it had even received approval, Dow began touting Loyant.

35.     For example, in a Dow AgroSciences Update PowerPoint presentation presented at the 2016 Louisiana Ag Technology & Crop Management Conference, Dow represented that Loyant had "Excellent rice safety with no yield reductions/delays."

36.     In a Dow produced pamphlet called *Levee Talk* from March 2016, Dow wrote that "Loyant herbicide will be an effective tool in the fight against herbicide resistant weeds. It will help control troublesome broadleaf weeds, grasses and sedges in rice through an alternative mode of action, Rinskor active."

37.     In announcing EPA registration of Loyant, Dow representatives further touted Loyant's attributes: "'I think what Loyant is going to bring to the rice community and the farmer is a robust herbicide solution,' says Hunter Perry, field research and development specialist with Dow AgroSciences. 'If you just sit back and simply look at the spectrum that Loyant is going to be bringing to the grower we pick up problematic sedges – rice flatsedge and yellow nutsedge. We control barnyardgrass and broadleaf signalgrass.'"[1]

38.     In its Technical Data Sheet ("Data Sheet") for Loyant, which has been widely distributed to farmers, Dow represented to United States rice farmers, including Plaintiffs, that "Loyant has global utility in seeded rice and provides a solution for weed resistance issues in U.S.-grown rice.  The product has broad-spectrum activity on important grass, sedge, and broadleaf weed species, utilizes low use rate technology, and exhibits excellent crop tolerance in rice."

39.     Dow further represented that "Rice is tolerant to Loyant in medium- and long-grain varieties and hybrids" and that the product had the following attributes:

## PRODUCT ATTRIBUTES

- Post-emergence control of economically-important grass, broadleaf, and sedge weeds, including ALS-, ACCase-, HPPD-, propanil-, quinclorac-, glyphosate-, and triazine- resistant species
- Alternative mode of action in rice
- Low use rates
- Consistent weed control across variable conditions/ water management
- Rice is tolerant to Loyant in medium- and long- grain varieties and hybrids
- Rapid degradation in soil and tolerant plant tissue
- Favorable environmental fate, toxicology, and ecotoxicology profiles

---

[1] https://www.farmprogress.com/rice/loyant-herbicide-approved-use-rice-2018 (last visited July 10, 2019).

40.    Dow's Data Sheet also listed the "key weed" species that Loyant purportedly "controlled":

### KEY WEED SPECIES CONTROLLED IN U.S. RICE

| Grass Control[1] | Sedge Control[2] |
|---|---|
| Barnyardgrass | Smallflower umbrellasedge |
| Junglerice | Yellow nutsedge |
| Broadleaf signalgrass | Rice flatsedge |
| Tighthead Sprangletop* | Purple nutsedge |
| * Suppression | Rough-seed clubrush |

| Broadleaf/Aquatic Control[3] | |
|---|---|
| Velvetleaf | Spreading dayflower |
| Jointvetch | Ducksalad |
| Redstem | Falsepimpernel |
| Pigweed (includes palmer amaranth and redroot) | Monochoria |
| Ragweed | Arrowhead/bulltongue/grassy arrowhead |
| Common lambsquarters | Hemp sesbania |
| Horseweed | Cocklebur |
| Alligatorweed | Eclipta |
| Pitted morningglory | Redroot pigweed |
| Redweed | Roundleaf mudplantain |

41.    One of the weed species Dow represented Loyant would control was "Barnyardgrass." Dow further represented how Loyant would treat Barnyardgrass by including the following photograph and excerpt in the Technical Data Sheet:



*Barnyardgrass Control*
*Untreated (Left) - Treated with 1 pint/acre pre-flood of Loyant™ herbicide (Right)*

42.    In various written materials, Dow specifically represented, among other things, the following regarding Loyant:

- It provides rice farmers the "broadest spectrum of control in one herbicide solution"

- It provides "unmatched . . . control,"

- It "exhibits excellent crop tolerance in rice," meaning, that Loyant does not harm the rice plants. [2]

43.     In addition to the foregoing, on the label for Loyant, Dow further specifically represented: "Susceptible weeds emerged at the time of application *will be controlled*." (emphasis added).

44.     On its Twitter feed, Corteva active promoted Loyant, as well, suggesting, for example, that it would be a "game changer in rice" and that it "controls number one weed in rice: barnyardgrass."

45.     On its Corteva Agriscience website, Dow briefly acknowledged that rice crops may receive crop injury from Loyant but only under certain "adverse environmental conditions" and only on a "temporary" basis:

> Loyant® is a postemergence herbicide for rice that provides growers with a new tool to fight herbicide-resistant weeds. Rinskor™ active provides unmatched broadleaf, grass, sedge and aquatic weed control to rice growers who demand better solutions. …

> At Corteva Agriscience, we stand behind our products with the service and support our customers expect. And it's especially true with Loyant® herbicide. Since Loyant was launched in 2017, we've learned a lot through interactions with growers, consultants and applicators — and through in-depth technical research — about optimizing product performance for this year and beyond. …

> ***Rice crops grown under adverse environmental conditions, such as extreme cold or heat may express temporary crop injury when Loyant is applied, including minimal height reduction or leaf malformations.***
> …

---

[2] Loyant Herbicide Technical Data Sheet, Page 2, "CROP SAFETY" Section.

Loyant® herbicide provides growers broad-spectrum control in one herbicide solution that helps optimize yield and meets unique weed management needs.[3]

46.     Like its website, Dow's Loyant label goes on to state that following the application of Loyant, rice crops "may express *temporary crop injury* . . . including slight height reduction or leaf malformations" but that "[s]uch crop effects are *transient* and *do not effect yield*." (emphasis added).

## D.     Problems with Loyant

47.     Almost as soon as it first became available for use, farmers, including Boothe Farms and Rinehart Farms, began complaining about problems with Loyant destroying rice plants and negatively impacting yields.  Both Boothe Farms and Rinehart Farms notified their respective Dow representatives about the problems associated with Loyant and the damage it was causing to their rice crops.

48.     Agricultural Extension workers began discussing these problems, as well.   In addition, the herbicide did not work as represented in controlling various types of weeds and grasses.

49.     The University of Arkansas' Division of Agriculture Research and Extension has seen and reported on significant injury to rice plants with various applications of Loyant.

50.     In June 2018, Jarrod Hardke, a Rice Extension Agronomist, wrote "[t]here have been numerous calls of late about Loyant herbicide injuring rice."

51.     He reported that 14-21 days after application of the herbicide and flooding of the fields, "injury symptoms can begin to show up."  He posted pictures and described the injuries as:

---

[3] https://www.corteva.us/products-and-solutions/crop-protection/loyant.html#anchor_2 (emphasis added) (last visited May 27, 2020).

- "'onion-rolling' of leaves and 'buggy-whipping' where the leaves catch at the collar rather than releasing":





- "[B]unched nodes inside the stem":



13





- And leaves "blow[ing] out of the side of the boot:





52.     In January 2019, after the 2018 growing season, where there was for the first-time

extensive use of the herbicide, the Agriculture Extension Service reported numerous additional

calls about rice injury from Loyant.  Doing its own testing, the Extension Service found that in

using the labeled rate of Loyant (one pint per acre), applications of the herbicide made 4 days apart

resulted in *greater than 50% injury to the rice plants*.[4]

53.     Applications of the herbicide before fields were flooded similarly resulted in rice

plant injury of 34-44%.[5]

54.     Moreover, the Extension Service noted that barnyardgrass control from Loyant was

"less than expected."[6]

---

[4] http://www.arkansas-crops.com/2019/01/11/about-loyant-rice/ (last visited July 10, 2019).
[5] *Id.*
[6] *Id.*

55.     Ultimately, the Extension Service recommended to "avoid" applying Loyant to certain types of rice "unless absolutely necessary."[7]

56.     In June 2018, *Texas AgriLife* published an article entitled "Texas Rice: Loyant Herbicide Injury – What We Know Right Now." The articles noted that Texas agricultural officials had received "numerous calls from rice growers and crop consultants in Texas about crop response or injury issues associated with the new herbicide product Loyant." The officials described how they "walked several affected fields recently and also listened to rice growers and consultants. The [injury] response levels observed were higher than seen in trials and were noticed across different locations, soil types, etc." Ultimately, they "could not conclusively narrow down to a specific condition or set of conditions that are leading to these levels of crop response."[8]

57.     In July 2018, *The Bay City Tribune* published a similar article entitled, "New herbicide Loyant hurts rice crops." The article noted that Agrilife Extension agents in Matagorda County, Texas had received "numerous calls" from concerned farmers about Loyant injury. Symptoms of the injuries observed included "onion leafing (rolled leaves) and buggy whipping (leaves catch at the collar), twisting and stunting. Farmers have also noticed that the base of the plant swells and often turns purple."[9]

58.     In a June 2018 Podcast called "Mississippi Rice: Loyant – Injury and efficacy issues," Dr. Bobby Golden (and Extension rice and soil fertility agronomist) and Dr. Jason Bond, (a weed scientist with the Mississippi State University Delta Research and Extension Center), discussed problems with Loyant in Mississippi. They discussed that in the first round of spraying,

---

[7] *Id.*
[8] https://agfax.com/2018/06/27/texas-rice-loyant-herbicide-injury-what-we-know-right-now/ (last visited July 10, 2019).
[9] http://baycitytribune.com/community/article_2d78684c-8905-11e8-8361-6b01d19b10e5.html (last visited July 10, 2019).

Loyant worked fairly well, but in the second round of spraying, farmers lost a lot of efficacy.  They confirmed the issues were mainly with grass weeds and they were not seeing the levels of control he had seen in previous years.  In particular, they discussed "questions and concerns" about the level of control.[10]

59.     The Louisiana State University Ag Center's *Louisiana Rice Notes*, No. 2018-03 (April 20, 2018), noted that Loyant "can cause significant damages to rice when applied on rice grown on cut ground.  Rice will generally 'onion leaf' in this type of situation."

60.     In a PowerPoint presentation prepared for a University of Missouri rice meeting by the University of Arkansas Rice Research and Extension Center in Stuttgart, Arkansas, Director Bob Scott discussed "Loyant Issues in 2018."  He observed "off target movement," "varietal sensitivity," and "lack of performance."  In one test of barnyardgrass control, he noted that the average control was only 67%.

61.     In a 2019 PowerPoint presentation prepared by Professor and Elms farming Chair of Weed Science, Jason K. Norsworth, entitled "Rice Weed Control 2019, he noted that "[l]ower than expected control of some barnyardgrass populations was observed in the field last summer and again this winter in the greenhouse."

62.     Despite receiving numerous reports about the problems associated with the use of Loyant during the 2018 crop year and the knowledge that Loyant was not working as promised, Dow continued to market Loyant for use in 2019 and 2020 causing further damages to U.S. rice farmers including Dore Farms.

---

[10]  https://agfax.com/2018/06/22/mississippi-rice-loyant-injury-and-efficacy-issues-podcast/  (last visited July 10, 2019).

E.      **Plaintiffs' Representative Experience with Loyant**

1.      **Plaintiff Boothe Farms (Arkansas)**

63.     Mirroring the concerns expressed by numerous Agricultural Extension specialists in every state where Loyant was approved for use, Plaintiffs also saw significant problems with yield and weed control on their rice crops with their own use of Loyant.

64.     Boothe Farms has grown rice for over 33 years and operates a commercial rice farming operation in Lawrence County and Greene County, Arkansas.

65.     In the 2018 crop year, Boothe Farms solely planted the medium grain variety of rice known as "Titan." Titan is known as a high yielding medium grain variety of rice. Dow, through its agents and representatives, specifically knew the variety of rice that Boothe Farms had planted.

66.     In an effort to control the grass and weeds in their fields and because of Dow's representations regarding Loyant, including those laid out above, Boothe Farms purchased 342.5 gallons of Loyant at a total price of $91,573.75 for use on their rice farming operation for the 2018 crop year.

67.     Boothe Farms applied Loyant on ~1,550 rice acres of their operation with the correct usage rates, at the recommended time, and in accordance with Dow's labeling and specifications set forth by Dow. Boothe Farms elected not to apply Loyant on their remaining ~940 acres of rice.

68.     Following its application of Loyant, Boothe Farms began to notice that rice plants where Loyant had been applied exhibited signs of injury. Specifically, the rice began to show height reduction and/or leaf malformations. Since Dow's label stated that such may happen and

that "[s]uch crop effects are *transient* and *do not effect yield*," Boothe Farms relied upon such representations and continued caring for its crop.

69.     As for the grass and weeds, at first, Loyant appeared to slowly work as Dow represented it would.   Contrary to Dow's representations that "weeds emerged at the time of application *will be controlled*," however, the stunted grass and weeds began to grow again and were ultimately not controlled.

70.     Seeing that their fields that had been sprayed with Loyant were being overtaken by grass and weeds, Boothe Farms began spot spraying the fields with additional herbicide applications thereby increasing its labor, equipment, and chemical costs.

71.     After experiencing a resurgence of weeds and grass following the initial Loyant application and attempting to remedy the condition of the fields by spot-spraying and reapplying Loyant without success, Boothe Farms contacted Leslie Rogers, their Dow representative at the time, making several requests for Ms. Rogers to inspect the damage Loyant had caused to their rice fields. Ms. Rogers eventually did visit Boothe Farm's fields and performed her own inspection of those fields sprayed with Loyant.

72.     Ms. Rogers agreed with Boothe Farms that Loyant was not performing as intended and that the rice fields were "a growed up mess." Ms. Rogers represented that Boothe Farms would be refunded the cost of Loyant. However, Ms. Rogers shortly thereafter ceased working for Dow and Ms. Rogers' successor refused to refund Boothe Farms as promised.

73.     In addition to Boothe Farms' fields being overgrown with grass and weeds and contrary to Dow's representation that the injuries to the rice plants would be "*transient*" and would "*not effect yield*," as Boothe Farms approached harvest, the injuries to its rice plants were significant.   The rice plants and rice seed itself (where it survived Loyant), were severely and

19

permanently injured and/or damaged by Dow's Loyant, some of which failed to produce any rice seed at all.

74.     Boothe Farms' tracks their yields for each field with yield monitors on their combines.  Boothe Farms' use of Dow's Loyant caused their yields to be drastically reduced on those acres where Loyant was applied.  On the acres Plaintiffs sprayed with Loyant, the yield was approximately168 bushels per acre.  On the acres Boothe Farms did not spray with Loyant, which were otherwise treated substantially similar and in the same conditions as Loyant-treated acres, Boothe Farms' yield was approximately 195 bushels per acre.  As such, in addition to the added costs noted above, Dow's Loyant caused Plaintiff Boothe Farms' a total yield loss of ~41,850 bushels.[11]

75.     Dow's Loyant not only negatively impacted the yield (or the volume of rice produced from Boothe Farms' operation) due to the overgrowth of weeds and damaged rice plants, Loyant also damaged the overall grading quality of Boothe Farms' rice crop and its milling yield. Dow's Loyant damaged Boothe Farms' rice plants and, as a result, the kernels of rice those plants produced.  As an industry standard practice, Boothe Farms co-mingled his higher quality non-damaged rice from the non-Loyant fields with damaged rice from Loyant fields, resulting in an overall lower price for their rice than would have been received had they not used Loyant.

76.     Boothe Farms and the Class were injured by Dow's conduct due to the additional herbicide and labor costs they incurred, diminished bushel yields, reduced grading, and/or lower milling yield losses they suffered as a result of Dow's defective Loyant product.  In addition, Boothe Farms sustained damages in the form of paying Dow for a product that failed to work as promised.

---

[11] 27 bushels x 1,550 acres = 41,850 BU.

## 2.     **Plaintiff Rinehart Farms (Missouri)**

77.     Rinehart Farms has grown rice for over 40 years and operates a commercial rice farming operation in Butler County and Stoddard County, Missouri.

78.     In the 2018 crop year, Rinehart Farms planted the long grain varieties of rice known as "Diamond" and "Rice Tec 753." Dow, through its agents and representatives, specifically knew the varieties of rice that Rinehart Farms planted.

79.     In an effort to control the grass and weeds in their fields and because of Dow's representations regarding Loyant, including those laid out above, Rinehart Farms purchased 197.5 gallons of Loyant at a total price of $60,637.50 for use on their rice farming operation for the 2018 crop year.

80.     In 2018, Rinehart Farms planted 358 acres of the "Diamond" variety and 1,345.7 acres of the Ricetec 753 variety for a total of ~1,703.70 acres of rice. Rinehart Farms applied Loyant on all ~1,703.70 rice acres of its operation with the correct usage rates, at the recommended time, and in accordance with Dow's labeling and specifications set forth by Dow.

81.     Following its Loyant application, Rinehart Farms began to notice that some of the rice plants where Loyant had been applied exhibited signs of injury. Specifically, the rice began to show height reduction and/or leaf malformations. Since Dow's label stated that such may happen and that "[s]uch crop effects are *transient* and *do not effect yield*," Rinehart Farms relied upon such representations and continued caring for their crop.

82.     As for the grass and weeds, at first, Loyant appeared to slowly work as Dow represented it would. Contrary to Dow's representations that "weeds emerged at the time of application *will be controlled*," however, the stunted grass and weeds began to grow again and were not ultimately controlled.

83.     Seeing that their fields that had been sprayed with Loyant were being overtaken by grass and weeds, Rinehart Farms began spot spraying the fields with an additional herbicide application thereby increasing Rinehart Farms' labor, equipment, and chemical costs.

84.     Additionally, upon noticing that Loyant was not working as expected or warranted by Dow, Rinehart Farms and its field scout David Howard contacted their Dow representative, Phillip Cooley, about the problems Rinehart Farms was having with Loyant. Mr. Cooley visited the Rinehart Farms fields where Loyant had been applied and acknowledged that Loyant was not working.

85.     Mr. Cooley indicated that Dow would provide some additional chemical to remedy the field conditions caused by Loyant's application. Mr. Cooley did provide some additional chemical to Rinehart Farms with instructions from Dow on how to apply the chemical to the rice fields where Loyant had previously been used. This additional chemical plan did not solve the problem and Rinehart Farms continued to complain to Mr. Cooley about the damages caused by Loyant.

86.     Mr. Cooley subsequently told Rinehart Farms that no additional chemical could be provided due to a shortage resulting from other farmers experiencing similar issues with Loyant. Dow had been informed that the problems with Loyant had also occurred south of Missouri and Dow was running low on the additional chemical they were providing to farmers in an attempt to remedy Loyant damage. During the time Mr. Cooley was trying to obtain more of the additional chemical from Dow for Rinehart Farms, Mr. Cooley ceased working for Dow and Rinehart Farms did not hear anything further from Dow.

87.     In addition to Rinehart Farms' fields being overgrown with grass and weeds and contrary to Dow's representation that the injuries to the rice plants would be "*transient*" and would

"*not effect yield*," as Rinehart Farms approached harvest, the injuries to their rice plants were significant. The rice plants and rice seed itself (where it survived Loyant), were severely and permanently injured and/or damaged by Dow's Loyant, some of which failed to produce any rice seed at all.

88.    Rinehart Farms' use of Dow's Loyant also caused its rice yields to be drastically reduced. On the acres Rinehart Farms sprayed with Loyant, the yield was significantly less than such acres historically produced, was less than what other operations in the area produced under the same or similar conditions and where Loyant was not applied, and the yield was less than what it would have been had the acres not been sprayed with Loyant. As such, in addition to the added costs noted above, Dow's Loyant caused Rinehart Farms damages in the form of yield loss.

89.    Dow's Loyant not only negatively impacted the yield (or the volume of rice produced from Rinehart Farms' operation) due to the overgrowth of weeds and damaged rice plants, Loyant also damaged the overall grading quality of their rice crop and its milling yield. Dow's Loyant damaged Rinehart Farms' rice plants and, as a result, the kernels of rice those plants produced thus negatively affecting the grading and milling quality of their rice. As a result, Rinehart Farms suffered damage in the form of an overall lower price for their rice than would have been received had they not used Loyant.

90.    Rinehart Farms and the Class were injured by Dow's conduct due to the additional herbicide and labor costs they incurred, diminished bushel yields, reduced grading, and/or lower milling yield losses they suffered as a result of Dow's defective Loyant product. In addition, Rinehart Farms and the Class sustained damages in the form of paying Dow for a product that failed to work as promised.

### 3.   Plaintiff Dore Farms (Louisiana)

91.     Dore Farms has grown rice for almost 30 years and operates a commercial rice farming operation in Acadia Parish, Louisiana.

92.     In the 2019 crop year, Dore Farms planted the medium grain variety of rice known as "Titan." Titan is known as a high yielding medium grain variety of rice. Dow, through its agents and representatives, specifically knew the variety of rice that Dore Farms had planted.

93.     In an effort to control the grass and weeds in his fields and because of Dow's representations regarding Loyant, including those laid out above, Dore Farms purchased Loyant for use on a portion of his rice farming operation for the 2019 crop year.

94.     Dore Farms applied Loyant on ~107 rice acres of his operation with the correct usage rates, at the recommended time, and in accordance with Dow's labeling and specifications set forth by Dow. Dore Farms elected not to apply Loyant on their remaining ~693 acres of rice.

95.     Following its Loyant application, Dore Farms began to notice that some of the rice plants where Loyant had been applied exhibited signs of injury. Specifically, the rice plants were stunted. Since Dow's label stated that "[s]uch crop effects are *transient* and *do not effect yield*," Dore Farms relied upon such representations and continued caring for their crop, but the injury was lasting and did not resolve.

96.     As for the grass and weeds, at first, Loyant appeared to slowly work as Dow represented it would. Contrary to Dow's representations that "weeds emerged at the time of application *will be controlled*," the stunted grass and weeds began to grow again more vigorously and were not ultimately controlled.

97.     Dore Farms' use of Dow's Loyant caused its rice yields to be drastically reduced. On the acres Dore Farms sprayed with Loyant, the yield was significantly less than such acres

historically produced, was less than what other operations in the area produced under the same or similar conditions and where Loyant was not applied, and the yield was less than what it would have been had the acres not been sprayed with Loyant. As such, Dow's Loyant caused Dore Farms damages in the form of yield loss.

98.     Dow's Loyant not only negatively impacted the yield (or the volume of rice produced from Dore Farms' operation) due to the stunting of the rice plant and the overgrowth of weeds, Loyant also damaged the overall grading quality of his rice crop and its milling yield.   As a result, Dore Farms suffered damage in the form of an overall lower price for his rice than would have been received had he not used Loyant.

99.     Dore Farms and the Class were injured by Dow's conduct due to the additional costs they incurred, diminished bushel yields, reduced grading, and/or lower milling yield losses they suffered as a result of Dow's defective Loyant product.  In addition, Dore Farms and the Class sustained damages in the form of paying Dow for a product that failed to work as promised.

## CLASS ALLEGATIONS

100.    Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23 on behalf of the following statewide Rice Producer Classes corresponding to the state in which Plaintiff purchased and used Loyant on rice crops:

- All persons and entities in Arkansas who purchased and used Loyant on rice crops from the 2018 crop year to the present. ("Arkansas Rice Producer Class")

    Class Representative: Boothe Farms

- All persons and entities in Louisiana who purchased and used Loyant on rice crops from the 2019 crop year to the present. ("Louisiana Rice Producer Class")

    Class Representative: Dore Farms

- All persons and entities in Missouri who purchased and used Loyant on rice crops from the 2018 crop year to the present. ("Missouri Rice Producer Class")

Class Representative: Rhinehart Farms

101.    Excluded from the Class is the Court and its officers, employees, and relatives: Defendants and its subsidiaries, officers, directors, employees, contractors, and agents; and governmental entities.

102.    Each Plaintiff is a member of the Rice Producer Class he or she seeks to represent.

103.    The class is so numerous that joinder of all members is impracticable. The exact number of all class members can only be determined through discovery, but there were 2,198,000 acres of long grain rice and 707,000 acres of medium grain rice planted in the U.S. in 2018. In 2019, 2,057,000 acres of long grain rice and 658,000 acres of medium grain rice were planted in the U.S.

104.    Farmers planted 1,440,000 acres of long and medium grain rice in Arkansas; 440,000 acres in Louisiana; and 224,000 acres in Missouri in 2018.  In 2019, farmers planted 1,301,000 acres of long and medium grain rice in Arkansas; 420,000 acres in Louisiana; and 193,000 acres in Missouri.  Together, these three states account for the majority of domestic long and medium grain rice production in the U.S. with Arkansas alone accounting for almost half of such production.

105.    Defendants marketed Loyant for use in long and medium grain varieties and hybrids in Arkansas, Louisiana, and Missouri, as well as Texas and Mississippi from 2018 to the present.  According to various reports, there have been a number of complaints of injury to rice crops related to the use of Loyant and there are likely thousands of farmers who used Loyant on rice fields.  As a result, joinder of all class members in a single action is impracticable.

106.    The Class is ascertainable because its members can be identified by objective criteria.  Individual notice can be provided to Class members "who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).

107.    There are numerous questions of law and fact common to the class.  All Plaintiffs grew rice and purchased and used Loyant.  In addition, all Plaintiffs suffered damage and financial injury due to Dow's misrepresentations and tortious conduct.

108.    The common questions of law and fact include, but are not limited to, the following:

a)      Whether Defendants are liable to Plaintiffs under any theory alleged;

b)      Whether injury to Plaintiffs was foreseeable;

c)      Whether Defendants owed a duty of care to Plaintiffs;

d)      Whether Defendants breached a duty of care and were negligent;

e)      Whether Defendants' conduct caused harm to Plaintiffs;

f)      Whether Plaintiffs suffered financial losses as a result of their purchase and use of Loyant;

g)      Whether Defendants researched, designed, developed, manufactured, tested, promoted, marketed, advertised, distributed, labeled, and/or sold Loyant in a defective and unreasonably dangerous condition;

h)      Whether Defendants failed to provide adequate warning to purchasers of the defective and unreasonably dangerous condition of Loyant;

i)      Whether Defendants knew Loyant was defective and unreasonably dangerous when put to its reasonably anticipated use;

j)      Whether Defendants negligently designed and marketed Loyant;

k)      Whether Defendants failed to use ordinary care by neglecting to provide an adequate warning of the defects and dangers of Loyant;

l)      Whether Loyant was fit for its ordinary purposes; and

m)      Whether Defendants suppressed or concealed material facts about safety and efficacy of Loyant.

109.    Plaintiffs' claims are typical of the members of the class because the claims arise from the same course of conduct by Defendants and are based on the same legal theories. Plaintiffs also seek the same forms of relief as class members.  Plaintiffs applied Loyant to rice fields and

27

sustained financial injury as a result. The claims of each individual Plaintiff would necessarily require proof of the same material and substantive facts and produce the same type of relief.

110.    Plaintiffs will fairly and adequately represent the interests of the class. Plaintiffs' interests are the same as other class members in holding Defendants responsible for the willful and negligent release of Loyant and ensuring that those injured are fairly compensated for the harm resulting from Defendants' wrongful conduct. Plaintiffs have retained experienced counsel who are well-versed in class actions and complex litigation.

111.    Common questions of law and fact as outlined above predominate over questions affecting only individual Plaintiffs such that a class action is superior to other available methods for fairly and efficiently adjudicating this controversy. Class treatment will permit large numbers of similarly situated persons to prosecute claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that would be produced by numerous individual actions in multiple jurisdictions. Resolution of common issues would materially advance the disposition of the litigation as a whole.

112.    This case raises questions of law and fact which require class adjudication to prevent the risk of inconsistent rulings, varying adjudications, and incompatible standards of conduct for Defendants. The maintenance of separate actions would likewise place a substantial and unnecessary burden on the courts greatly inconveniencing the judicial system. All of these factors illustrate the benefits of concentrated litigation in a single forum.

113.    Alternatively, the class should be certified as to particular issues under Federal Rule of Civil Procedure 23(c)(4).

## CLAIMS FOR RELIEF

### COUNT I – BREACH OF EXPRESS WARRANTY
**(Asserted by Arkansas and Missouri Plaintiffs and Arkansas and Missouri Rice Producer Classes)**

114.     Arkansas and Missouri Plaintiffs, individually and on behalf of the Arkansas and Missouri Rice Producer Classes ("Plaintiffs," for purposes of this Count), repeat and allege Paragraphs 1-113, as if fully alleged herein.

115.     Dow is and was at all relevant times a "merchant" with respect to Loyant products under the Uniform Commercial Code.

116.     Loyant is and was at all relevant times a "good" within the meaning of the Uniform Commercial Code.

117.     Dow made numerous affirmations of fact as well as promises, guarantees, and descriptions to purchasers related to Loyant that became part of the basis of the bargain.

118.     Representations by Dow include that:

a)     Loyant would lower use rates;

b)     Loyant crop effects such as height reduction or leaf malformation would be temporary and have no effect on yield;

c)     Loyant, a post emergence herbicide, would control susceptible weeds emerged at the time of application;

d)     Loyant is tolerant in long and medium grain varieties of rice and hybrids;

e)     Loyant provides "umatched broadleaf, grass, sedge and aquatic weed control to rice growers;" and

f)     Loyant can be used in a manner that will not damage rice crops and "exhibits excellent crop tolerance in rice."

119.     The representations of Dow created an express warranty that Loyant would conform therewith.

120.    Dow's representations were made for the purpose of inducing reliance on the part of Plaintiffs and Plaintiffs did rely on the representations in purchasing Loyant.

121.    Loyant did not conform to the express warranties created by Dow.

122.    Plaintiffs provided notice directly to Defendants of the damages sustained as a result of the use of Loyant by contacting their respective Dow representatives regarding the conditions of the rice fields impacted by Loyant, requesting an inspection of the rice fields, and seeking a remedy.

123.    Plaintiffs are persons Dow would have reasonably expected to rely on the express warranties and be affected by the defective and unreasonably dangerous condition of Loyant.

124.    As a direct and proximate cause of the failure of Loyant to conform to the express warranties, Plaintiffs were damaged.

## COUNT II – BREACH OF IMPLIED WARRANTY
### (Asserted by Arkansas and Missouri Plaintiffs and Arkansas and Missouri Rice Producer Classes)

125.    Arkansas and Missouri Plaintiffs, individually and on behalf of the Arkansas and Missouri Rice Producer Classes ("Plaintiffs," for purposes of this Count), repeat and allege Paragraphs 1-113, as if fully alleged herein.

126.    Dow is and was at all relevant times a "merchant" with respect to Loyant products under the Uniform Commercial Code.

127.    Loyant is and was at all relevant times a "good" within the meaning of the Uniform Commercial Code.

128.    A warranty that Loyant was in merchantable condition and fit for the ordinary purpose for which herbicides are used is implied by law.

129.    Loyant, when sold and at all times thereafter, was not in merchantable condition and is not fit for the ordinary purpose for use as herbicide. Specifically, Loyant is inherently defective because it damages rice crops and/or fails to protect against barnyardgrass and other grasses and weeds, resulting in it not being fit for the purposes for which it was marketed and sold to Plaintiffs.

130.    Plaintiffs provided notice directly to Defendants of the damages sustained as a result of the use of Loyant by contacting their respective Dow representatives regarding the conditions of the rice fields impacted by Loyant, requesting an inspection of the rice fields, and seeking a remedy.  In addition, Defendants received numerous individual communications from and related to Rice Producer Class Members experiencing and suffering damages from Loyant's failures, which provided Dow with pre-suit notice within a reasonable time of realizing the product's defects.

131.    Allowing Dow additional opportunity to cure its breach of implied warranties is unnecessary and would be futile here as Plaintiffs have already suffered damages and financial harm.

132.    As a direct and proximate result of Dow's breach of the implied warranty of merchantability and fitness, Plaintiffs were damaged.

## COUNT III – NEGLIGENCE
### (Asserted by Arkansas and Missouri Plaintiffs and Arkansas and Missouri Rice Producer Classes)

133.    Arkansas and Missouri Plaintiffs, individually and on behalf of the Arkansas and Missouri Rice Producer Classes ("Plaintiffs," for purposes of this Count), repeat and allege Paragraphs 1-113, as if fully alleged herein.

31

134.     Dow owed Plaintiffs a duty of care in researching, designing, developing, manufacturing, testing, promoting, marketing, advertising, distributing, labeling, and/or selling Loyant.

135.     Dow breached the legal duties owed to Plaintiffs by failing to exercise the care that a reasonably prudent person would exercise in like circumstances including failing to adequately design Loyant in manner that would not cause injury to Plaintiffs and failing to give reasonable and adequate warning of the dangers inherent or reasonably foreseeable in the use of Loyant;

136.     The harm to Plaintiffs related to Loyant was foreseeable by Dow and greatly outweighs any benefit derived from Loyant.

137.     Dow knew or should have known that their conduct would naturally and probably result in damage to others including Plaintiffs but continued such conduct in reckless disregard for the consequences.

138.     Dow's negligence constitutes a direct and proximate cause of the damages suffered by Plaintiffs.

## COUNT IV – NEGLIGENT DESIGN
### (Asserted by Arkansas and Missouri  Plaintiffs and Arkansas and Missouri Rice Producer Classes)

139.     Arkansas and Missouri Plaintiffs, individually and on behalf of the Arkansas and Missouri Rice Producer Classes ("Plaintiffs," for purposes of this Count), repeat and allege Paragraphs 1-113, as if fully alleged herein.

140.     Dow designed Loyant in the ordinary course of business.

141.     Dow had a duty to use ordinary care in designing and selecting materials for Loyant in order to protect users from unreasonable risk of harm.

142.     The dangers of Loyant were foreseeable by Dow.

143. The application of Loyant by agricultural producers on rice fields was an intended and reasonably anticipated use.

144. Dow failed to use ordinary care in the design of Loyant because Loyant cannot be safely and effectively used in all long and medium grain varieties of rice and hybrids as marketed by Dow and causes damage to rice crops.

145. The design of Loyant is defective and unreasonably dangerous.

146. The negligent design of Loyant directly and proximately damaged Plaintiffs.

### COUNT V – NEGLIGENT FAILURE TO WARN
**(Asserted by Arkansas and Missouri Plaintiffs and Arkansas and Missouri Rice Producer Classes)**

147. Arkansas and Missouri Plaintiffs, individually and on behalf of the Arkansas and Missouri Rice Producer Classes ("Plaintiffs," for purposes of this Count), repeat and allege Paragraphs 1-113, as if fully alleged herein.

148. Dow researched, designed, developed, manufactured, tested, promoted, marketed, advertised, distributed, labeled, and/or sold Loyant in the ordinary course of business.

149. Dow had a duty to give an adequate warning of the dangers inherent or reasonably foreseeable when Loyant is used in the manner intended or as reasonably anticipated.

150. The unreasonable risk of harm presented by Loyant was foreseeable by Dow.

151. The application of Loyant by agricultural producers on rice fields was an intended and reasonably anticipated use.

152. Loyant was defective and unreasonably dangerous at the time of sale when put to its intended and reasonably anticipated use because Loyant was not safe and effective and damaged rice crops including, but not limited to, causing permanent height reduction and/or leaf malformation, overgrowth of grass and weeds, and a negative impact on yield and milling quality.

33

153.   Dow failed to provide an adequate warning of the dangers associated with the use of Loyant and the effects on rice crops and, in fact, misrepresented and concealed the dangers.

154.   Plaintiffs did not have knowledge of the defective and unreasonably dangerous nature of Loyant at the time of purchase or use.

155.   Plaintiffs were damaged as direct and proximate result of Loyant being sold without an adequate warning.

## COUNT VI – STRICT LIABILITY (DESIGN DEFECT)
### (Asserted by Arkansas and Missouri Plaintiffs and Arkansas and Missouri Rice Producer Classes)

156.   Arkansas and Missouri Plaintiffs, individually and on behalf of the Arkansas and Missouri Rice Producer Classes ("Plaintiffs," for purposes of this Count), repeat and allege Paragraphs 1-113, as if fully alleged herein.

157.   Dow was engaged in the business of researching, designing, developing, manufacturing, testing, promoting, marketing, advertising, distributing, labeling, and/or selling Loyant.

158.   Dow supplied Loyant in a defective condition because Loyant was unsafe for reasonably foreseeable use.

159.   The dangers of Loyant extended beyond that contemplated by the ordinary and reasonable purchaser or user.

160.   The design of Loyant caused damage to rice crops when used as intended and reasonably anticipated.

161.   The ordinary and reasonable purchaser or user of Loyant would not have expected a product designed for application on rice fields to be intolerant to rice and cause damage to rice crops.

34

162.    The design of Loyant directly and proximately damaged Plaintiffs.

## COUNT VII – STRICT LIABILITY (FAILURE TO WARN)
### (Asserted by Arkansas and Missouri Plaintiffs and Arkansas and Missouri Rice Producer Classes)

163.    Arkansas and Missouri Plaintiffs, individually and on behalf of the Arkansas and Missouri Rice Producer Classes ("Plaintiffs," for purposes of this Count), repeat and allege Paragraphs 1-113, as if fully alleged herein.

164.    A product is defective if it lacks an adequate warning or instructions for safe use rendering the product unreasonably dangerous beyond the contemplation of the ordinary purchaser or user.

165.    Dow knew or should have known of the dangers associated with Loyant and failed to provide an adequate warning or instructions for safe use by label or otherwise.

166.    Purchasers of Loyant were unaware of the dangers that were foreseeable by Dow.

167.    Loyant labels and marketing materials were false, misleading, and failed to contain warnings or instructions to prevent harm to rice crops.

168.    Loyant was defective and unreasonably dangerous at the time of sale when put to its intended and reasonably anticipated use of application to rice fields.

169.    Plaintiffs were damaged as direct and proximate result of Loyant being sold without an adequate warning or instructions for safe use.

## COUNT X – LOUISIANA REDHIBITION, LA C.C. ART. 2520, ET SEQ.
### (Asserted by Louisiana Plaintiff and the Louisiana Rice Producer Class)

170.    Louisiana Plaintiff and the Louisiana Rice Producer Class ("Plaintiffs," for purposes of this Count), repeat and allege Paragraphs 1-113, as if fully alleged herein.

171.    The seller of a product warrants the buyer against redhibitory defects or vices in the thing sold.

172.    Loyant contains defects or vices that render it useless or its use so inconvenient that Plaintiffs would not have purchased it had they known about the vices or defects.

173.    Loyant fails to perform as intended and causes damage to rice crops when used as reasonably anticipated.

174.    Dow, as the manufacturer and seller of Loyant, is deemed to know of the defects and vices associated with Loyant.

175.    Loyant's redhibitory defects or vices harmed Plaintiff entitling them to the return of the purchase price paid for Loyant, interest from the date of purchase, reimbursement of reasonable expenses, damages, and attorney's fees.

## COUNT XI – LOUISIANA PRODUCTS LIABILITY ACT, LA REV. STAT. ANN. §§ 9:2800.51, ET SEQ.
### (Asserted by Louisiana Plaintiff and the Louisiana Rice Producer Class)

176.    Louisiana Plaintiff and the Louisiana Rice Producer Class ("Plaintiffs," for purposes of this Count), repeat and allege Paragraphs 1-105, as if fully alleged herein.

177.    Loyant is unreasonably dangerous and defective when used for its intended purposes as an herbicide applied to rice fields.

178.    Loyant is unreasonably dangerous in design because Loyant cannot be safely and effectively used in all long and medium grain varieties of rice and hybrids as marketed by Dow and causes damage to rice crops.

179.    Alternative products exist which would not have caused the damages suffered by Plaintiffs and the damages suffered far outweigh Dow's burden of adopting an alternative design.

180.    Loyant is defective because Dow failed to provide an adequate warning of the dangers associated with the use of Loyant and its effects on rice crops and further misrepresented and concealed the dangers.

181.    Dow expressly warranted that Loyant would not hurt rice crops and rice farmers were induced to purchase and use Loyant as a result of those representations.

182.    At all material times, Dow knew or should have known that rice crops could be injured by the use of Loyant.

183.    Plaintiffs did not know that Loyant could harm rice crops.

184.    The damages sustained by Plaintiffs were proximately caused by the unreasonably dangerous and defective condition of Loyant.

## COUNT XII – VIOLATION OF MISSOURI CROP PROTECTION STATUTES
### (Asserted by Missouri Plaintiff and the Missouri Rice Producer Class)

185.    Missouri Plaintiff and the Missouri Rice Producer Class ("Plaintiffs," for purposes of this Count), repeat and allege Paragraphs 1-113, as if fully alleged herein.

186.    It is a violation of the Missouri Crop Protection Act to "intentionally cause the loss of any crop." Mo. St. § 569.132.

187.    Plaintiffs have a civil cause of action for crop losses pursuant to Mo. Stat. § 537.353.

188.    Mo. Stat. § 537.353(1) provides, " Any person or entity who knowingly damages or destroys any field crop product that is grown for personal or commercial purposes… shall be liable for double damages pursuant to this section." The court may also award costs and attorney's fees. Mo. Stat. § 537.353(4).

189.    The rice crops of Plaintiffs are grown for commercial purposes.

190.    Dow intentionally and knowingly damaged and destroyed the rice crops of Plaintiffs for the purpose of encouraging sales of Loyant for its own financial gain.

191.     At a minimum, Plaintiffs are entitled to compensatory damages as well as costs and attorney's fees for Defendant's negligence in damaging and destroying their rice crops. Mo. Stat. § 537.353(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the statewide Rice Producer Classes represented, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

1.     That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiffs are proper class representatives; and appoint Plaintiffs' attorneys as Class Counsel;

2.     That the Court grant permanent injunctive relief to prohibit Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

3.     That Plaintiffs be granted the declaratory relief sought herein;

4.     That the Court award Plaintiffs and the other Class Members compensatory, consequential, and general damages in an amount to be determined at trial;

5.     That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts, omissions, and practices;

6.     That the Court award statutory damages and/or punitive or exemplary damages to the extent permitted by law;

7.     That the unlawful acts alleged in this Complaint be adjudged and decreed to be breach of express warranty, breach of implied warranty, negligent, strictly liable, and violations of various state consumer protection statutes and crop protection statutes;

8.      That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, including fees and expenses;

9.      That the Court award pre- and post-judgment interest at the maximum legal rate; and

10.     That the Court grant all such other relief as it deems just and proper.


Respectfully Submitted,

Dated: 6 / 19 / 2020

Clayton Smaistrla (Arkansas Bar No. 2012299)
Saucier & Smaistrla PLLC
Clayton Smaistrla PC
200 Concord Plaza Drive, Suite 750
San Antonio, TX 78216
Telephone:      210-901-8112
Facsimile:      210-338-8916
Email:          clayton@s2lawfirm.com

Stephen B. Murray, Jr.
Arthur M. Murray
Jessica W. Hayes
Murray Law Firm
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone:      504-525-8100
Facsimile:      504-584-5249
E-mail:         smurrajr@murray-lawfirm.com
                amurray@murray-lawfirm.com
                jhayes@murray-lawfirm.com

James Pizzirusso
Hausfeld LLP
1700 K St., NW, Ste 650
Washington, DC 20006
Telephone:      202-540-7200
Facsimile:      202-540-7201
E-mail:         jpizzirusso@hausfeld.com

Charles A. Banks (Arkansas Bar No. 73004)
Banks Law Firm
711 West Third Street
Little Rock, AR 72201
Phone: 501-280-0100
Facsimile: 501-325-0565
Email: cbanks@bankslawfirm.us

Kimberly A. Fetsick
Hausfeld LLP
33 Whitehall Street
14th Floor
New York, New York 10004
Telephone: (646) 357-1100
Facsimile: (212) 202-4322
E-mail: kfetsick@hausfeld.com